*E-Filed 4/8/14*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DANIEL SANDIGO, | No. C 12-0085 RS (PR) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| G.D. LEWIS, et al., | Docket No. 47 |
| Defendants. | |

## INTRODUCTION

In this federal civil rights action brought under 42 U.S.C. § 1983, plaintiff Daniel Sandigo, an inmate at Pelican Bay State Prison ("PBSP"), alleges that defendants, PBSP employees, violated his due process rights by using insufficient and unreliable evidence to determine he was still an active gang associate and to retain him in the Secured Housing Unit ("SHU"). Defendants Warden G.D. Lewis, Chief Deputy Warden K. McGuyer, Institutional Gang Investigation Unit ("IGI") Lieutenant D. Barneburg, IGI Lieutenant K. Osborne, IGI Sergeant J. Frisk and IGI Officer S. Burris move for summary judgment.[1] Plaintiff has filed an opposition and a motion to strike and defendants have filed a reply. For the reasons stated below, Defendants' motion for summary judgment is GRANTED and Plaintiff's motion to strike is denied.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Plaintiff was first

---

[1] C.M. Rogers, C. Tileston and K. Morgan were also named as Defendants but were dismissed and terminated from the action because they were never served with the complaint. *See* Docket No. 38

validated as an associate of the gang called the Mexican Mafia in October 2004. This determination was based, in part, on eight source documents evidencing that Plaintiff held a leadership position within the Mexican Mafia when he was housed at Calipatria State Prison. (Burris Dec. re Motion to File Under Seal, Exs. A-H.)[2] These documents showed that Plaintiff used outside maildrops to communicate with other validated gang members to discuss gang business, collect taxes on behalf of the gang, and order assaults by the gang on two other inmates housed at Calipatria State Prison. Id.

On May 19, 2010, Plaintiff appeared before the PBSP Institutional Classification Committee ("ICC") and was referred to the IGI for his six-year active/inactive gang activity review. Sandigo Dec. ¶ 28; Comp. ¶ 16. On June 28, 2010, Officer Burris disclosed to Plaintiff the information being used in the active/inactive review and advised Plaintiff that he would be interviewed within twenty-four hours. Burris Dec., Ex. E (June 29, 2010 IGI Gang Validation Chrono located in Plaintiff's Central File.) Officer Burris disclosed confidential information to Plaintiff through two 1030 Confidential Information Disclosure Forms. Burris Dec., Exs. B, C, and E. These documents informed Plaintiff that two different gang rosters had been confiscated from known gang associates, and that the rosters included Plaintiff's gang moniker with Plaintiff's cell location and street origin. Id.; Comp. ¶¶ 19-21; Sandigo Dec. ¶¶ 31-32.

On June 29, 2010, Officer Burris interviewed Plaintiff regarding the gang-validation packet. Comp. ¶ 23; Burris Dec., Ex. E. Plaintiff provided a written response and added in the interview, "I can't help what somebody else has in their cell." Burris Dec., Ex. D.

On December 6, 2010, Plaintiff appeared before the Unit Classification Committee ("UCC"), which retained Plaintiff in the SHU pending the issuance of the "128-B," an institutional form documenting the final decision on Plaintiff's gang status. Comp. ¶ 31. On December 31, 2010, Plaintiff received a copy of the 128-B confirming the determination that he was classified as an active gang associate. Comp. ¶ 32.

---

[2] On November 6, 2013, the Court granted Defendants' motion to file exhibits under seal. (Docket No. 56.)

**DISCUSSION**

**I. Standard**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party; if, as to any given fact, evidence produced

1 by the moving party conflicts with evidence produced by the non-moving party, the court
2 must assume the truth of the evidence set forth by the non-moving party with respect to that
3 fact. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

**II.     Due Process Claim**

Plaintiff does not challenge his original validation as a gang member in October 2004 or the evidence upon which that validation was based. Instead, he challenges the May 2010 determination that he remains an active gang associate and the evidence on which that determination was based.

**A. Overview of Regulations Pertaining to Gang Validation Procedures**

The following are relevant California regulations regarding validating inmates as gang members and associates. Inmates whose conduct endangers others' safety or the institution's security are housed in the SHU. Cal. Code Regs., tit. 15, § 3341.5(c). A validated gang member or associate is deemed to be such a threat. *Id.* § 3341.5(c)(2)(A)(2). The initial classification of an inmate as a gang member or associate requires at least three independent source items that must contain factual information or, if from a confidential source, must meet the test of reliability established by prison regulations. *Id.* § 3378(c)(2). At least one source item must show a direct link between the inmate and a current or former gang member or associate. *Id.* § 3378(c)(4). Source items must be documented and staff must articulate why they are evidence of gang activity. *Id.* § 3378(c)(8)(B).

An inmate housed in the SHU as a gang member or associate may be considered for review of inactive status when the inmate has not been involved in gang activity for a minimum of six years. *Id.* § 3378(e). This regulation specifically provides:

> An inmate housed in a security housing unit (SHU) as a gang member or associate may be considered for review of inactive status by the Department Review Board when the inmate has not been identified as having been involved in gang activity for a minimum of six (6) years. Verification of an inmate's inactive status shall be approved or rejected by the chief, OCS, or a designee. . . .

Cal. Code Regs., tit. 15, § 3378(e).

Even if the inmate is granted inactive status, the regulations do not require officials to release him from the SHU:

4

> As provided at section 3378(e), the Departmental Review Board (DRB) may authorize SHU release for prison gang members or associates categorized as inactive. The term inactive means that the inmate has not been involved in gang activity for a minimum of six (6) years. . . .The DRB is authorized to retain an inactive gang member or associate in a SHU based on the inmate's past or present level of influence in the gang, history of misconduct, history of criminal activity, or other factors indicating that the inmate poses a threat to other inmates or institutional security.

Cal. Code Regs., tit. 15, § 3341.5(c)(5).

**B. Liberty Interest**

The parties first dispute whether Plaintiff has a protected liberty interest in being released from the SHU. Interests that are procedurally protected by the Due Process Clause may arise from two sources: the Due Process Clause itself and laws of the states. *Meachum v. Fano*, 427 U.S. 215, 223-27 (1976). In the prison context, these interests are generally ones pertaining to liberty. Changes in conditions so severe as to affect the sentence imposed in an unexpected manner implicate the Due Process Clause itself, whether or not they are authorized by state law. *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Vitek v. Jones*, 445 U.S. 480, 493 (1980) (transfer to mental hospital), and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (involuntary administration of psychotropic drugs)). Deprivations that are less severe or more closely related to the expected terms of confinement may also amount to deprivations of a procedurally protected liberty interest, provided that the liberty interest in question is one of "real substance." *Sandin*, 515 U.S. at 477-87. An interest of "real substance" will generally be limited to freedom from restraint that imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or "will inevitably affect the duration of [a] sentence." *Id.* at 484, 487. In determining whether a restraint is an "atypical and significant hardship," the court considers whether the challenged condition mirrored the conditions imposed on inmates in administrative segregation and protective custody, the duration of the condition and degree of restraint imposed, and whether the discipline will invariably affect the duration of the inmate's sentence. *Chappell v. Mandeville*, 706 F.3d 1052, 1064-65 (9th Cir. 2013).

There is some uncertainty as to whether, in addition to a liberty interest of real

5

substance, there also must be state statutes or regulations that narrowly restrict the power of prison officials to impose the deprivation in order for a procedurally protected liberty interest to be found. *Compare Sandin*, 515 U.S. at 483-84 ("we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause"), *and id.* at 486 ("We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest") *with Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life'"). Almost twenty years after *Sandin* was decided, the uncertainty continues. *Compare Chappell*, 706 F.3d at 1063-64 (focus should be only on the atypical and significant hardship test) with *id*. at 1065-66 (concurring opinion) (majority improperly reads *Sandin* to find a state-created liberty interest based only on the existence of an atypical and significant hardship and without the need for the state actually to create a liberty interest).

Defendants argue the *Chappell* concurrence means a protected liberty interest must be found in state statutes or regulations that narrowly restrict the power of prison officials to impose the deprivation. If this is the case, an inmate could have no liberty interest in an inactivity review, because the regulations permit, but do not require, the review of the active/inactive status of an inmate and permit, but do not require, the release from the SHU of an inmate determined to be an inactive gang member or associate. *See* Cal. Code Regs., tit. 15, §§ 3341.5(c)(5) and 3378(e). If, after *Sandin*, narrowly restrictive state statutes or regulations are required to create a liberty interest, Plaintiff's claim would fail at this point. However, because there is uncertainty about whether appropriate statutory or regulatory language is necessary to establish a protected liberty interest, review of the second requirement of establishing a protected liberty interest, upon which there is unanimous agreement, that is, whether Plaintiff has a liberty interest of real substance, is warranted.

6

The parties' "real substance" argument focuses on the Supreme Court case which held that conditions in the Ohio State Penitentiary ("OSP"), Ohio's Supermax facility, imposed an atypical and significant hardship within the correctional context such that an inmate had a protected liberty interest in avoiding assignment to that facility. *Wilkinson v. Austin* 545 U.S. 209, 223-24 (2005). The conditions at the OSP, which the Court found to constitute an atypical and significant hardship, included: exclusion of almost all human contact; dimmed light for twenty-four hours; exercise for only one hour per day in a small indoor room; indefinite placement reviewed only annually; and disqualification of otherwise eligible inmates for parole consideration. *Id.*

Plaintiff provides undisputed evidence of conditions at the PBSP SHU which are at least as harsh, if not more so, than the conditions at the OSP. This weighs in favor of finding that Plaintiff has a protected liberty interest in being released from the SHU. However, Defendants rely on cases holding that, when there is no change in the inmate's living conditions, there is no imposition of a restraint that imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *See Ruiz v. Cate*, 2010 WL 546707, at \*3 (N.D. Cal. Feb. 10, 2010); *Pina v. Tilton*, 2008 WL 4773564, at \*4 (N.D. Cal. Oct. 28, 2008) (where conditions of confinement did not change, there was no imposition of a restraint that imposed atypical and significant hardship in relation to ordinary incidents of prison life); *Martinez v. Scribner*, 503 Fed. Appx. 550, 550 (9th Cir. 2013) ("Martinez's retention in administrative segregation after he served his 15-month term in the Segregated Housing Unit did not impose an 'atypical and significant' hardship on [him] in relation to the ordinary incidents of prison life."). It is also notable that *Wilkinson* found a liberty interest in an inmate's avoiding placement in the OSP; it did not address a decision to retain an inmate in the OSP. *See Wilkinson*, 545 U.S. at 213, 225. Based on this authority, Plaintiff's retention in the SHU, which create no change in his living conditions, did not create an atypical and significant hardship on him in relation to the ordinary incidents of prison life.

Plaintiff's arguments focus on comparing conditions in the PBSP SHU with

conditions in the general population and with conditions in the SHUs at other California prisons. However, Plaintiff does not address the above-cited cases finding no atypical and significant hardship where conditions of confinement do not change based on the defendants' activities, as in his case.

Therefore, Plaintiff's due process claim fails on both prongs of the analysis of whether he has a protected liberty interest. It fails on the first prong because the active/inactivity review, which resulted in Plaintiff's retention in the SHU, did not deprive him of an interest of real substance. It fails on the second prong because the applicable regulations are discretionary in nature that permit, but do not require, the review of the active/inactive status of the inmate and permit, but do not require, the release from the SHU of an inmate determined to be an inactive gang member or associate.

Even assuming that Plaintiff has a liberty interest in being released from the SHU, his claim still fails because he does not show there was a violation in any due process protections or that the evidence upon which Defendants relied to find him an active gang associate does not qualify as "some evidence."

**C. Process Due**

The process constitutionally due to an inmate placed in segregation depends on whether the placement is disciplinary or administrative. *Toussaint v. McCarthy*, 801 F.2d 1080, 1099 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). In *Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003), the Ninth Circuit determined that California's policy of placing suspected gang members in segregation is an administrative decision, undertaken to preserve order in the prison. When an inmate is placed in segregation for administrative purposes, due process requires only the following procedures:

> Prison officials must hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated. The prison officials must inform the prisoner of the charges against the prisoner or their reasons for considering segregation. Prison officials must allow the prisoner to present his views. . . . [D]ue process [ ] does not require detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation.

*Toussaint*, 801 F.2d at 1100-01 (footnote omitted).

The process due to Plaintiff at his inactivity hearing, then, was the minimal procedural protections of adequate notice and an opportunity to be heard. *Bruce*, 351 F.3d at 1287. Plaintiff does not dispute that he received adequate notice of his 2010 active/inactivity review and an opportunity to be heard. Thus, there is no dispute that he received the minimal protections required for procedural due process. However, Plaintiff vigorously contends that the evidence on which Defendants relied to determine he remained a gang associate does not constitute the "some evidence" required by due process. *See Bruce*, 351 F.3d at 1287.

### D. Some Evidence Requirement

Defendants argue that, in light of *Wilkinson v. Austin*, a federal court does not review gang-validation decisions for "some evidence." Plaintiff argues that *Wilkinson* applies "only to the unique factors operating within the OSP," and that Ninth Circuit precedent requires that indeterminate SHU segregation based on gang validation be supported by "some evidence." Opp'n at 10-11.

In *Superintendent v. Hill*, 472 U.S. 445, 455 (1985), the Supreme Court held that disciplinary proceedings do not satisfy due process requirements unless there is "some evidence" in the record to support the findings of the prison disciplinary board. Based on *Hill*, the Ninth Circuit held that "some evidence" also must support a decision to place an inmate in segregation for administrative reasons. *See Toussaint*, 801 F.2d at 1104. This standard applies to placement in a SHU for gang affiliation. *Bruce*, 351 F.3d at 1287-88 (noting that any one of three pieces of evidence -- a sheriff's department report that prisoner was a gang member, a probation report that prisoner's codefendant was a gang member, and a statement from a prison informant -- would constitute "some evidence"). The standard is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced. *Toussaint*, 801 F.2d at 1105 (citing *Hill*, 472 U.S. at 455). Ascertaining whether the standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence. *Id.* Instead, the relevant question is whether there is any evidence in the record that could support the

conclusion reached. *Id.*

In *Wilkinson*, the Supreme Court applied the framework established in *Mathews v. Eldridge* 424 U.S. 319 (1976) to the OSP procedures to determine if they met the requirements for due process. *Wilkinson*, 545 U.S. at 224-25. The Court determined, "A balance of the *Mathews* factors yields the conclusion that Ohio's New Policy is adequate to safeguard an inmate's liberty interest in not being assigned to OSP." *Id.* at 228. The Court continued, "Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in *Greenholtz v. Inmates of Neb. Penal and Correctional Complex*, 442 U.S. 1, 16 (1979), and *Hewitt v. Helms*, 459 U.S. 460, 473-76 (1983), provide the appropriate model." *Wilkinson*, 545 U.S.. at 228-29. The Court then noted that *Greenholtz* held the process due for inmates being considered for release on parole includes the opportunity to be heard and notice of any adverse decision and that *Hewitt* held the level of process due for inmates being considered for transfer to administrative segregation includes notice of the charges and an opportunity to be heard. *Id.* at 229. The Court concluded by stating that, "these cases remain instructive for their discussion of the appropriate level of procedural safeguards. Ohio's New Policy provides informal, nonadversary procedures comparable to those we upheld in *Greenholtz* and *Hewitt*, and no further procedural modifications are necessary in order to satisfy due process under the *Mathews* test." *Id.*

Thus, the *Wilkinson* opinion has language that supports the arguments of both parties. It supports Plaintiff's view in that it specifically applied the *Mathews* due process requirements to the procedures provided in the OSP. It supports Defendants' view because it included general statements that the process due was that which was established in *Greenholtz* and *Hewitt*: notice of the charges and an opportunity to be heard. Significantly, however, although *Wilkinson* issued in 2005, Defendants have not provided any Ninth Circuit cases holding that *Wilkinson* overruled its precedent that "some evidence" must support a decision to place an inmate in segregation for administrative reasons. To the

10

contrary, Defendants note that, in a recent opinion, the Ninth Circuit upheld the "some evidence" requirement in the gang-validation context. *See Castro v. Terhune*, 712 F.3d 1304, 1314 n.4 (9th Cir. 2013).

Defendants attempt to distinguish *Castro* on the ground that it did not mention *Wilkinson* and, thus, it "did not confront the full extent of intervening Supreme Court authority." Motion at 13. In *Castro*, the court stated, "Due process guarantees Castro that the evidence used to validate him meet the 'some evidence' evidentiary standard." *Id.* at 1314. In a footnote, it distinguished *Swarthout v. Cooke*, 131 S. Ct. 859 (2011), which held that due process does not require "some evidence" to deny an inmate parole. *Id.* at 1314 n.4. In so stating, the court noted that in *Swarthout*, Justice Ginsburg's concurring opinion highlighted the distinction between the process due in parole revocation proceedings from the process due in administrative proceedings such as the revocation of good time credits. *Id.*

In light of the fact that *Wilkinson* preceded both *Castro* and *Swarthout* by many years, it seems unlikely the Ninth Circuit or the Supreme Court were unaware of its impact on their rulings and, had it made a difference, the courts would have mentioned it. Based on the Ninth Circuit's *post-Wilkinson* validation of the "some evidence" requirement and the fact that there is no authority for Defendants' theory that *Wilkinson* overruled Ninth Circuit precedent, *Toussaint* and *Bruce* remain valid precedent in the Ninth Circuit. Therefore, Defendants were required to have some evidence to support their determination of Plaintiff's active gang status.

### E. Some Evidence at Plaintiff's Validation Hearing

As stated previously, ascertaining whether the "some evidence standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence; the relevant question is whether there is any evidence in the record that could support the conclusion reached. *Toussaint*, 801 F.2d at 1105. The Ninth Circuit also requires that the evidence relied upon by prison disciplinary boards contain "some indicia of reliability," *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987), but has not directly considered whether a corresponding need for evidentiary

11

1 reliability exists when prison officials segregate an inmate for administrative reasons. Some
2 district courts have extended the reliability requirement to the administrative context,
3 however, holding that "the evidence relied upon to confine an inmate to the SHU for gang
4 affiliation must have 'some indicia of reliability' to satisfy due process requirements."
5 *Madrid v. Gomez*, 889 F. Supp. 1146, 1273-74 (N.D. Cal. 1995); *see Jones v. Gomez*, 1993
6 WL 341282, *3-4 (N.D. Cal. Aug. 23, 1993) (due process requires indicia of reliability due
7 to high risk of false information by informants, inherent prisoner conflicts and necessity for
8 independent factfinding by prison officials).

9       Defendants present ten source items for the Court's *in camera* review. Eight of these
10 source items were used to validate Plaintiff as a gang associate in 2004. Plaintiff does not
11 challenge the reliability of these eight items. Therefore, for the purposes of this motion, they
12 are considered to be reliable. As mentioned previously, these items show that Plaintiff was
13 in a leadership position within the Mexican Mafia, was collecting taxes on behalf of the
14 gang, and had ordered assaults by the gang on two other inmates.

15       Nonetheless, Plaintiff moves to strike the eight source items and objects to them on
16 the ground that, because they relate to events that occurred in 2004, they are not relevant to
17 his current active/inactive review which must show that he was an active gang member
18 within the six years before the date of the review. These source items, however, show the
19 high level of involvement Plaintiff had with the Mexican Mafia in 2004, which is relevant to
20 the determination of whether he was a member of that gang in 2010, when his inactivity
21 hearing was held. Under *Cato* and *Bruce*, the evidentiary requirements to meet the some
22 evidence standard are minimally stringent where any evidence can be considered. *See Cato*,
23 824 F.2d at 705; *Bruce*, 351 F.3d at 1287. Accordingly, Plaintiff's objection to these eight
24 source items is overruled and his motion to strike them is denied.

25       The two other source items are two different gang rosters, confiscated at different
26 times from two validated Mexican Mafia associates, that list Plaintiff as a current gang
27 member within the last six years. The first roster, identifies Plaintiff as being housed in unit
28 D10, cell number 101, with his moniker, "D Boy," and his street origin. Plaintiff was housed

12

1  in unit D10, cell number 101 from June 5, 2007 through November 13, 2007.  The second
2  confidential gang roster was dated "11/08," and includes Plaintiff's gang moniker, street
3  origin, housing unit and section within the unit.

4         The IGI officers who reviewed these rosters recognized that the fact an inmate's name
5  was on the rosters did not meant that he participated in overt gang activity.  At the same time,
6  they concluded, the fact that inmates' personal and housing information were on the list
7  indicated they had provided their personal information to the roster-maker and, thus, they
8  were in contact with a validated gang associate.  Burris Dec., Exs. I, J (Under Seal).  They
9  also concluded, based on their experience, that the purpose of the rosters was to relay gang-
10 related information from one housing unit to another and one gang affiliate to another and
11 that an inmate's name would only appear on the rosters if he was considered to be in good
12 standing with the gang at the time the rosters were written.  *Id.*

13        These source items more than suffice to meet the minimally stringent "some evidence"
14 standard.  *See e.g., Escalante v. Hubbard*, No. C 10-01583, 2010 U.S. Dist. LEXIS 130215,
15 at *6 (N.D. Cal. Nov. 22, 2010) (roster of gang associates prepared for use by the gang,
16 identifying inmate by his neighborhood of origin and gang moniker, comported with due
17 process requirements).  They are also reliable because they were confiscated from known
18 gang associates and were not volunteered by confidential informants.

19        Plaintiff challenges the gang rosters on several grounds.  First, he argues that such
20 rosters are just lists and, thus, do not show he has been involved in gang activity.  He argues
21 that, without an accompanying Rules Violation Report ("RVR") documenting actual gang
22 activity on his part, the evidence is not relevant to show he is an active gang member.  Yet,
23 Plaintiff does not cite any legal authority requiring an accompanying RVR to substantiate
24 evidence of gang activity and, as noted previously, the Due Process Clause does not require
25 such a high standard for meeting the "some evidence" requirement.  Furthermore, many
26 courts have held such rosters constitute reliable "some evidence" of an inmate's gang
27 affiliation.  *See e.g., Bruce*, 351 F.3d at 1287-88 (documents identifying plaintiff as a gang
28 member constitute some evidence); *Esclante*, 2010 U.S. Dist. LEXIS 130215, at *6; *Barrios*

13

*v. Gonzales*, No. C 10-01122, 2011 U.S. Dist. LEXIS 71389, *19 (E.D. Cal. Jun. 30, 2011) (written roster of active gang associates is "reliable evidence"); *Castro v. Prouty*, No. C 09-01763, 2011 U.S. Dist. LEXIS 16694, *10 (E.D. Cal. Feb. 2, 2011) (notes naming an inmate as being involved in gang activity is some evidence); *Freemon v. Ryan*, 2011 WL 5169342, at *13 (D. Ariz. Oct. 31, 2011) (denying inmate's argument that membership lists not "some evidence" because he did not author or possess the lists).

Plaintiff attempts to distinguish these cases on the ground they address initial validation hearings and not inactivity hearings such as his. He contends while the first validation hearing requires evidence only of an inmate's "status" as a gang member or associate, the inactivity hearing requires more specific evidence of "actual gang activity." Plaintiff relies on California Code of Regulations, title 15, section 3378(c)(1), which defines current gang activity as "any documented gang activity within the past six (6) years."

As discussed above, the IGI officers who reviewed the two source items concluded that, although they did not indicate the listed inmates participated in overt gang activity, they did indicate these individuals had been in contact with a validated gang member. This is sufficient, under the lenient some evidence standard, to show Plaintiff actively participated in the gang in the last six years.

In his complaint, Plaintiff asserts Defendants' reliance on the confiscated gang rosters violated the terms of the settlement agreement in *Castillo v. Alameida*, C 94-2847 MJJ (N.D. Cal.), which prohibited the use of "laundry lists" in gang validation proceedings. However, the *Castillo* settlement agreement does not provide a basis for an inmate's § 1983 claim because it does not provide a right secured by the Constitution or laws of the United States, the violation of which is a necessary element of a § 1983 claim. *See e.g., Lopez v. Horel*, 2007 WL 2177460, at *1, n.1 (N.D. Cal. Jul. 27, 2007); *Thomas v. Dotson*, 2011 WL 1740343, at *3 (E.D. Cal. May 5, 2011). Furthermore, the source items here are not laundry lists, which were defined in *Castillo* as lists from confidential sources, including debriefers, which raised significant reliability concerns. Wolf Dec., Ex. A *Castillo* Settlement Agreement ¶ 21. The source items here were confiscated from known gang associates and

were not volunteered to prison officials. Therefore, their reliability is not open to question in the same way as a list provided by a confidential informant.

In summary, Plaintiff's due process claim fails for several reasons. First, his conditions of confinement have not changed and, thus, his claim does not implicate a protected liberty interest. Further, no state statute or regulation is such that a protected liberty interest is created in being released from the SHU based upon a determination at an activity/inactivity review hearing. If due process is implicated, Plaintiff received notice and an opportunity to respond to the charges against him, which are all the procedural protections required. Further, reliable "some evidence" supports Defendants' determination that Plaintiff is an active gang associate.

Accordingly, Plaintiff has not succeeded in raising a dispute of material fact that Defendants violated due process in concluding he was an active member of the Mexican Mafia. Summary judgment is granted in favor of Defendants.[3]

### III. Qualified Immunity

In the alternative, Defendants argue they are entitled to summary judgment on the grounds of qualified immunity. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The issue of qualified immunity generally entails a two-step process, which requires the court first to determine whether the defendant violated a constitutional right, and then to determine whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court modified the Saucier test and "gave courts discretion to grant qualified immunity on the basis of the 'clearly established' prong alone, without deciding in the first instance whether any right had been violated." *James v. Rowlands*, 606 F.3d 646, 650-51 (9th Cir. 2010) (discussing

---

[3] Defendants argue separately that Warden Lewis and Lieutenant Osborne are entitled to summary judgment because Plaintiff fails to allege any action by them that led to the due process violation. In light of the fact that the Court has found no due process violation and has granted Defendants' motion for summary judgment, this additional argument is moot.

*Saucier* standard after *Pearson*).  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Saucier*, 533 U.S. at 202; *see, e.g.*, *Estate of Ford v. Caden*, 301 F.3d 1043, 1049-50 (9th Cir. 2002) (court may grant qualified immunity by viewing all of the facts most favorably to plaintiff and then finding that under those facts the defendants could reasonably believe they were not violating the law).

As noted above, there was no constitutional violation pertaining to Plaintiff's due process claim.  Thus, on these facts, viewed in the light most favorable to Plaintiff, Defendants prevail as a matter of law on their qualified immunity defense because the record establishes no due process violation.  *See Harlow*, 457 U.S. at 818.  In any event, even if a constitutional violation had occurred with respect to Plaintiff's claim, in light of clearly established principles at the time of the incident, Defendants could have reasonably believed their conduct was lawful.

As discussed previously, it is not clear that due-process rights are implicated for continued confinement in the SHU.  Several district courts have held that they are not.  *See e.g. Ruiz*, 2010 WL 546707, at *3; *Pina*, 2008 WL 4773564, at *4.  Further, Plaintiff received the procedural protections required by the Due Process Clause and reliable "some evidence" supported the determination of Plaintiff's continued status as an active gang associate.  Reasonable officers, in these circumstances, would have believed that the determination to continue Plaintiff's status as an active gang associate and to retain him in the SHU was lawful.  Accordingly, Defendants are also entitled to summary judgment on the basis of qualified immunity.

## CONCLUSION

Based on the foregoing:

1. Defendants' motion for summary judgment is granted.

2. Plaintiff's motion to strike evidence is denied.  (Docket No. 59).

3. The Clerk of the Court shall enter a separate judgment and close the file.

4. This Order terminates Docket No. 47.

16

**IT IS SO ORDERED**.

DATED: April 8, 2014

_____
RICHARD SEEBORG
United States District Judge